1
2
3
4
5
6
7

8            **UNITED STATES DISTRICT COURT**

9            **EASTERN DISTRICT OF CALIFORNIA**

10

11   BAKERSFIELD PIPE & SUPPLY, INC.,       )   Case No.: 1:14-cv-001445 - JLT
                                            )
12                  Plaintiff,              )   ORDER DENYING DEFENDANT'S MOTION
                                            )   FOR SUMMARY JUDGMENT
13           v.                             )
                                            )
14   CORNERSTONE VALVE, LLC, et al.,        )
                                            )
15                  Defendants.             )
                                            )
16   _____)

17           Bakersfield Pipe & Supply, Inc. asserts Cornerstone Valve and Nitesh Gupta, the owner and

18   president of Cornerstone, are liable for breaching a purchase order.  (Doc. 23)  Defendants contend

19   Plaintiff is unable to succeed on its claims and seek summary judgment pursuant to Rule 56 of the

20   Federal Rules of Civil Procedure.  (Doc. 48)  For following reasons, Defendants' motion for summary

21   judgment is **DENIED**.

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

                                            1

# I.      Undisputed Material Facts[1,2]

Bakersfield Pipe & Supply is a supply company that "provides materials and services to a broad spectrum of industrial, refining, oil field, energy, pharmaceutical, pulp and paper, and food processing companies." (PUF 1)  Plaintiff maintains "a contractual relationship with Paladon Systems Limited which is an actuator manufacturing company headquartered in England." (PUF 3)  BPS sells actuators manufactured by Paladon "under the name 'Paladon Americas,' a fictitious business of BPS." (PUF 4)

On May 28, 2013, Eii Valve submitted a "Request for Quote" identified as RFQ-120068 to BPS/Paladon Americas. (PUF 7)  Annette Sealy, an employee of Eii Valve, told Plaintiff: "We have this project, but it was bid with a very narrow margin – please be as competitive as you can when quoting." (*Id.*)  On June 3, 2016, Bob Smith, the general manager for the Paladon Americas operations of BPS, prepared quote identified as "06032013" in response to RQF-120068. (PUF 10; Smith Decl. ¶ 10)

Smith "communicated with Annette Sealy and Tom Thompson," while working on quote 06032013. (PUF 10)  "Based on the various conversations" with Tom Thompson, who introduced himself as the Vice President of Eii Valve, "Smith made numerous revisions to quote 06032013." (PUF 11, 13)  Smith reports that during these conversations, "Thompson told [him] that the project was in Iraq." (PUF 14)

"On June 14, 2013, Bob Smith and Roan Staggers of Paladon Americas attended a capabilities demonstration at the Cornerstone Valve office with Tom Thompson and defendant N.K. Gupta." (PUF 15)  Smith reports this meeting was the first time he met Thompson and Gupta in person. (PUF 16)  By this time, Smith learned "Eii Valve was merging with Cornerstone Valve" and Thompson said

---

[1] In the Court's Scheduling order, the parties were directed to meet and confer prior to filing any motion for summary judgment, and instructed that "**the moving party shall file [a] joint statement of undisputed facts**." (Doc. 17 at 4, emphasis in original)  Further, in any notice of a motion for summary judgment, the moving party was directed to "certify that the parties have met and conferred … or set forth a statement of good cause for the failure to meet and confer." (*Id.*)  Despite these explicit instructions, Defendants filed a motion for summary judgment *without* certifying the parties met and conferred, or preparing a joint statement of undisputed material facts.  Rather, Defendants filed only a "Separate Statement of Undisputed Facts" with their motion. (Doc. 48-1).  Plaintiff also filed a separate statement of facts (Doc. 50), with many facts that are not disputed by Defendants (*see* Doc. 58-15).

**Defendants are reminded to comply with the Court's Orders, and cautioned that a future failure to comply with the Court's orders will result in the imposition of sanctions, including the motion being dropped from the Court's calendar**.  *See Malone v. U.S. Postal Service*, 833 F.2d 128, 130 (9th Cir. 1987) (imposing sanctions for failure to comply with a court order).

[2] For purposes of this motion, the Court will refer to the facts Defendants provided as "DUF" and the facts Plaintiff provided as "PUF".

"the project would move forward under Cornerstone Valve." (PUF 17)  At the demonstration, "Gupta told Bob Smith that Gupta had bid the project with preliminary pricing for the automation and had received a purchase order." (PUF 18)  In addition, Smith reported that Gupta said "the customer for the project was a very important customer to [him]." (PUF 19)  After the demonstration meeting with Thompson and Gupta, "Smith continued to make revisions to quote 06032013 based on communications with Tom Thompson and [his] contacts with the Paladon factory in Europe." (PUF 20)

On July 3, 2013, Thompson wrote an email to Smith in which he stated: "I need the quickest shipment possible under 20 weeks.  Once I know the valve schedule I can pass that to you and then you have 1-2 weeks to have the actuators in.  We can discuss some dates and parameters on Monday that will work for you to make the incentive." (PUF 22; Smith Decl. ¶ 16)

On July 8, 2013, the parties discussed "the idea of Cornerstone making a deposit on the project."[3] (PUF 23)  On July 9, Smith submitted a revision of quote 06032013 to Cornerstone, "and emailed the link to the BPS credit application." (PUF 28)  "Thompson informed Bob Smith that Cornerstone had selected Paladon Americas for the project and he would be writing a purchase order that day and would send it over as soon as it was blessed by Gupta." (PUF 29)

On July 10, 2013, Cornerstone submitted a credit application to BPS "requesting $2,000,000 in credit." (PUF 31; Doc. 52-5 at 1-3)  The application noted, "By signing below the undersigned Acknowledges and Accepts Bakersfield Pipe And Supply, Inc. Terms And Conditions…" (Doc. 52-5 at 2)  The application was signed just below this statement by Randall Merritt and Tom Thompson. (*Id.*)  Importantly, the Terms and Conditions provide:

> (a) **Delay**.  Seller shall not be liable for failure to deliver or delays in delivery occasioned by causes beyond seller's control, including without limitation, strikes, lockouts, fires, embargos, war or other outbreak of hostilities, acts of God, inability to obtain shipping space, machinery breakdowns, delays of carriers or suppliers, and domestic or foreign or governmental acts or regulations…. (d) **Cancellation of Merchandise**.  Cancellation of standard items may be honored only if the request is received prior to shipment.  Custom made or special items may not be cancelled unless cancellation precedes the in-process manufacture of the item.

---

[3] The parties disagree regarding who initiated the conversation regarding the 10% deposit. Bob Smith asserts Thompson proposed it and that in "more than 30 years of experience in the actuation business [Smith]… never requested a deposit from a customer." (Doc. 52 at 4, ¶ 17)  On the other hand, Defendants assert, without identifying any supporting evidence, that "[i]t was plaintiff who wanted the 10% down, and not the defendant." (Doc. 58-15 at 6).

3

(*Id.* at 3)

BPS approved the credit application on July 11, 2013.  (PUF 32)  The same day, "Paladon Americas received a purchase order from Cornerstone for 112 actuators and related controls and other equipment in the total of $2,249,615.78," which was labeled as "PO #P766"  (PUF 33; Doc. 52-6 at 1)  The purchase order "did not contain any reference to a down payment or a ten percent payment."  (PUF 35; *see also* Doc. 52-6 at 1-3)  Rather, the section identified as "Payment Terms" on the form indicated: "If credit card payment, supplier must receive a credit card authorization form duly completed and signed by CSV rep."  (Doc. 52-2 at 1)  Further, the purchase order included specific delivery dates for items on the order, "the earliest of which was January 10, 2014."  (PUF 36)  Smith asserts, "Thompson had made it clear… if Paladon Americas performed in the timeline requested, that there were additional large scale projects at Cornerstone that would need automation."  (PUF 30; Smith Decl. ¶ 19)

The day after receiving the purchase order from Cornerstone, Smith "provided Paladin Italia with a BPS purchase order for the various actuators."  (PUF 40; Doc. 52 at 6, Smith Decl. ¶ 24)  In addition, Smith arranged a "kickoff meeting" at the Paladon Italia factory in Italy.  (PUF 41)

The purchase order was revised on July 19, 2013.  (Doc. 52-6 at 4)  The document, identified as "Revision #3," included the addition "Other Terms: 10% DOWN, NET 10 DAYS, VALIDITY 30 DAYS."  (*Id.*)  "On July 25, 2013, BPS amended the purchase order to Paladon Italia for the manufacture of Paladon actuators."  (PUF 53)

"On July 28, 2013, Bob Smith of BPS met with Tom Thompson of Cornerstone in Italy to attend a kickoff meeting the following day at the Paladon Italia factory."  (PUF 48)  During the meeting, Thompson told Smith "the end user (i.e., the Cornerstone customer) was the Iraq National Oil Company for [the] project."  (PUF 49; Doc. 52 at 6, Smith Decl. ¶ 28)  In addition, Smith reports that Thompson said "if Cornerstone delivered 25 percent of the project by the end of the year then Cornerstone would be essentially guaranteed the next large project from the Cornerstone customer."  (PUF 50; Doc. 52 at 7, Smith Decl. ¶ 29)  On July 29, Thompson "toured the Paladon Italia factory," where "manufacturing was underway."  (PUF 51)

Cornerstone project manager Kiley Wallace "began regularly communicating with BPS/ Paladon Americas" regarding project 120068 by August 1, 2013.  (PUF 54)  She told Smith the order

4

1   was "extremely critical" and they "need to do everything… to streamline the process and deliver early."

2   (PUF 55)  Wallace received "the Paladon Americas production schedule, estimate[d] delivery times for

3   controls, technical drawings for the actuators, and updates on the delivery schedule for the actuators."

4   (PUF 56)  Smith reports that after August 1, he "regularly heard from Ms. Wallace regarding the

5   project schedule both by phone and email," and she "essentially was on [him] to get this project done as

6   fast as possible."  (Doc. 52 at 7, Smith Decl. ¶ 31)

7        Additional revisions were made to the purchase order, and the final revision dated August 13,

8   2013 was identified as "PO #P766, Revision #5."  (Doc. 48-3 at 69; Doc. 52-8 at 1)  Revision #5

9   indicated the payment terms: "10% DOWN, NET 10 DAYS, VALIDITY 30 DAYS."  (*Id.*)  In

10   addition, the purchase order "contained the same deadlines for completion, including a first shipment

11   deadline of January 10, 2014."  (PUF 47; *see also* Doc. 48-3 at 69-72)

12        On August 27, 2013, "Wallace provided Paladon Americas estimated delivery schedules for

13   both valves and actuators," which were to be supplied by Cornerstone "so that BPS could mount the

14   actuators to the valves and test the same."  (PUF 38-39, 57)  By this date, "BPS had placed purchase

15   orders for all necessary controls and mounting hardware necessary to ensure that BPS would meet the

16   P766 deadlines."  (PUF 58)  On August 30, "Wallace demanded to know from Paladon Americas the

17   status of the automation package drawings as her client wanted to review them."  (PUF 59)  Smith

18   reports Wallace continued to request—and receive—updates on the project schedule.  (Doc. 52 at 9,

19   Smith Decl. ¶ 39)

20        On October 1, 2013, Smith emailed Wallace and Thompson to inform them that Paladon Italia

21   had "21 units of the initial 24 units ready to ship."  (PUF 61)  Two days later, Smith requested the

22   "current valve schedule" from Cornerstone, inquiring when the valves would be received for

23   automation.  (Doc. 58-7 at 2)  In response, Wallace informed Smith that Cornerstone had "not received

24   drawing approval from the customer yet" and requested to "hold off on making shipping arrangements

25   until these [were] received."  (*Id.*)

26        Smith again e-mailed Wallace for a schedule regarding "when the valves will be ready" for BPS

27   on October 10, 2013.  (Doc. 58-7 at 11)  She responded:

28        Originally, the first 37 were going to be air freighted tomorrow and completely
         assembled and tested by November 2. We have put the shipment of the valves on hold

5

1
2
3
4

until we receive approved drawings from the Customer, so I don't have a real schedule yet. Once the approved documents are received, I can provide you with this information. I was hoping the documents would come this week, but we have yet to receive them. The balance of the valves will not be ready to ship until December 10th and these will be going ocean freight so we will not receive them until January 10th. I will keep you updated each week with the progress of the documents and valves going forward

5   (Doc. 52-19 at 1, Smith Decl. Exh. 19; Doc. 58-7 at 9, Agarwal Decl. Exh. O)  Smith reports he was

6   "not really concerned" by Wallace's email "because (1) drawing delays are typical, … (2) some valves

7   were ready for shipment and (3) the remaining valves would be ready for shipment on December 10th."

8   (PUF 66; Doc. 52 at 10, Smith Decl. ¶ 44)

9        On October 17, 2013, Smith told Wallace "the final group of actuators needed for the original

10  shipment were now ready."  (PUF 67)  Smith "inquired whether she wanted them air freighted or ocean

11  freighted," to which Wallace responded:

12
13
14

We are still waiting on approval of the drawings. Once received we are going to ocean freight all the actuators and valves. The moment we receive the approved drawings, I will let you know so you can arrange shipment. I do understand this will affect delivery greatly, so once I give you the go ahead for shipment can you please provide a revised production schedule?

15  (PUF 67; Doc. 52-20)  A few days later, Wallace told Smith "drawing approval would not be received

16  until mid-November."  (PUF 68; *see also* Doc. 52-21 at 1)

17       On November 15, 2013, Wallace "requested . . . a status of the actuators that had shipped from

18  Italy to Houston."  (PUF 69)  In addition, Wallace informed Smith that she was "sorry to say the

19  drawings still [had] not been released," and the valves had not been released for shipment by

20  Cornerstone.  (Doc. 52-22 at 1)  By December 9, "all actuators for P766 had been manufactured by

21  Paladon Italia and had either already shipped to Houston or were in transit."  (PUF 70)

22       On December 13, 2013, "Smith was invited to meet with Tom Thompson at a new Cornerstone

23  manufacturing facility."  (PUF 71)  Smith attended the meeting with Tom Marlatt on behalf of Paladon

24  Americas.  (*Id.*)  Thompson gave Smith and Marlatt a tour of the facility, and told Smith "the valves

25  under construction on the factory floor were for a project that was ahead of the 120068 project."  (*Id.*)

26  "Thompson said the order was still good and as soon as the job under construction was completed, their

27  project would get back on schedule."  (*Id.*)

28       Smith requested a status update from Thompson and Wallace in January 2014, again inquiring

"when the valves would arrive so that Paladon Americas could mount the actuators." (PUF 72) The next day, Thompson responded: "Once we receive drawings back next week should have all this cleared up. I suggest we wait until the final drawings are returned. They are scheduled next month." (PUF 73)

On February 24, 2014, Smith sent Sealy an email, updating her regarding the progress on the order as follows:

> 1) The Group 16 actuator package for the 42" valve with Line Break controls is on hold at Paladon UK pending information. We need the trip pressures the customer wants for the line break controls. The actuator is built, most of the controls are purchased, but they cannot finalize and move forward without these pressures.
> 2) We have all the other actuators and controls in- house now. We have finished assembly of the actuators and controls for Groups 1, 3, 4 & 5. All other actuators are assembled and controls are here, just not installed.

(Doc. 52-27 at 1; *see also* PUF 75) Smith requested "a projected release date for [Cornerstone] valves for this project." (*Id.*, emphasis omitted) On March 21, 2014, Smith again asked for an update from Sealy and Thompson. (PUF 76) In response, Sealy said "she would meet with Gupta and provide an update to BPS on the status of the order." (PUF 77)

On March 27, 2014, Sealy reported "the order was still good, not cancelled, but [they] were still working on scheduling and she was going to meet with Gupta later that day." (PUF 78) On March 28 at 12:14pm, Thompson wrote Smith, saying Gupta would be in Dubai the following week "to finalize things," and the order was "now appearing on [the] production schedule." (Doc. 52-29 at 1) However, only hours later at 4:50pm, Gupta wrote an email to Cornerstone employees including Sealy and Thompson stating:

> [P]lease ask [P]aladon to hold all activity on this order. We have already advised them months back to hold the activity due to lack of funds from client. We are not responsible for any of the material in production. We are pressing hard with the client to release funds in order for us to do the same to [P]aladon. Till then job is on hold.

(PUF 81; Doc. 53-9 at 1)

"No one from Cornerstone ever told Paladon Americas that the job was on hold due to lack of funds from the client." (PUF 82) Wallace and Sealy testified that they never told Paladon Americas that "the project was on hold due to a lack of funds." (PUF 84, 85; *see also* Doc. 58-2 at 33, Wallace Depo. 115:18-21; Doc. 58-3 at 28, Sealy Depo. 115:17-19) Wallace reported no one told her the job

was on hold due to lack of funds.  (Doc. 53-2 at 33, Depo 155:22-24)  Similarly, Sealy reported she did not recall any discussion about a lack of funds prior to March 28, 2014.  (Doc. 58-3 at 28, Depo. 115:23-25)  Instead, Paladon Americas' representatives were told the job was being held for drawing approvals by the client.  (Doc. 58-15 at 17; Doc. 58-8 at 5)

On April 11, 2014, Smith and Marlatt went to the Cornerstone office for a meeting with Gupta. (Doc. 52 at 14, Smith Decl. ¶ 57)  Smith gave Gupta "an invoice for the 10 percent deposit."  (*Id.*; PUF 86)  "Gupta responded that he already spent the 10 percent Cornerstone received on another order." (*Id.*)  Gupta told Smith that "the order was on hold and ha[d] been on hold since December."  (*Id.*) "Gupta also stated that he was confident that the order was still good and he offered to have Jamie Farr of Cornerstone take pictures of the inventory at the Paladon Americas warehouse so that Gupta could send the pictures to his client and ask for more money."  (*Id.*)  Although Smith attempted to follow up with Gupta after the meeting, Gupta did not respond to his phone calls.  (*Id.*, ¶ 58)  Cornerstone never made the 10% payment.  (DUF 7)

## III.    Evidentiary Objections

Pursuant to Rule 56(c) of the Federal Rules of the Civil Procedure, "an affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Here, the parties object to the evidence proffered by the opponent and asserting it is not admissible for consideration.

### A.    Plaintiff's Evidentiary Objections

Defendants filed a declaration and report from John Hughett, PE, who was retained as an expert in the action and asserts that he "reviewed all of the documents provided to me in this case, including deposition transcripts, emails, transaction documents, etc."  (Doc. 48-5 at 2, Hughett Decl. ¶ 2)

Under the Federal Rules, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702.  However, "an expert witness cannot give an opinion as to [a] *legal conclusion*, i.e., an opinion on an ultimate issue of law."  *Nationwide Transp. Fin. v. Cass Info. Sys.,*

*Inc.,* 523 F.3d 1051, 1058 (9th Cir. 2008); *see also Crow Tribe of Indians v. Racicot,* 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law…. They do not testify about the law.") (citations and quotation marks omitted).

> ### 1.       Objections to the Declaration, Paragraph 5

In his declaration, John Hughett reported:

> My main opinion is that there was an agreement between plaintiff Bakersfield Pipe & Supply, Inc. and Cornerstone Valve, LLC, for Bakersfield Pipe & Supply, Inc. to manufacture and/or supply actuators, controls and mounting brackets. As a part of this agreement, the manufacture of the actuators was not to begin until 10% of the purchase order was paid by Cornerstone Valve, LLC. This 10% was never paid. Therefore, based on my extensive experience in the oil and gas industry, the manufacture of the actuators, controls and mounting brackets was never to begin until the 10% was paid by Cornerstone, as stated in the purchase order.

(Doc. 48-5 ¶ 5)

Plaintiff objects this statement "includes legal conclusion and impermissible opinion testimony."  (Doc. 55 at 2)  As Plaintiff observes, Hughett offers a conclusion as to whether Bakersfield Pipe & Supply and Cornerstone had a purchase agreement, and his interpretation of its terms. However, "the interpretation of contract language is a question of law."  *Atel Fin. Corp. v. Quaker Coal Co.*, 321 F.3d 924, 925-26 (9th Cir. 2003).  Thus, it is an issue "upon which the opinion of an expert may not be given." *PMI Mortgage Ins. Co. v. Amer. Int'l Specialty Lines Ins*. Co., 291 Fed. App'x. 40, 41 (9th Cir. 2008) (rejecting expert testimony that "went to the interpretation of the underlying settlement agreement, a contract"); *see also Nationwide Transp. Fin.,* 523 F.3d at 1058. Consequently, Plaintiff's objections to paragraph 5 of the declaration are **SUSTAINED**.

> ### 2.       Objections to Statements in the Report, Page 7

Plaintiff objects to Hughett's conclusion that "BPS did not in fact follow through with its demand that 10% of the purchase price is required at the time of order placement. Nor did BPS obtain a personal guarantee as is its custom and practice. BPS did not pay attention to these industry standards and in some instances purposely ignored these standards."  (Doc. 55 at 2, quoting Doc. 48-5 at 16)  In addition, Plaintiff objects to the statement that "BPS has practices and standards in this area that meet industry customs, recommended practices and standards."  (*Id.* at 3, quoting Doc. 48-5 at 16) Plaintiff contends these statements should not be considered because they lack foundation, are

speculative and conclusory, and offer "unqualified opinion[s] beyond the expertise and personal knowledge" of Hughett.  (*Id.* at 2, 3) (citing Fed. R. Evid. 602; *Hunt- Wesson Foods v. Ragu Foods, Inc.*, 627 F.2d 919 (9th Cir. 1980)).

Defendants assert that "[i]n the report, and during the deposition, during which time the plaintiff had ample opportunity to cross-examine on the basis of his findings, Hughett provided the basis for his findings."  (Doc. 58-14 at 2)  According to Defendants, Hughett "discussed his qualifications as it relates to the gas and oil industry, in terms of his knowledge of actuators and valves, and all other areas regarding his report and his qualifications."  (*Id.*)  While this may be so, Defendants chose to submit a declaration from Mr. Hughett and his report without further evidentiary foundation. Thus, the Court is confined to considering only the declaration and report when determining whether they are supported by an adequate foundation; they are not.

By stating "BPS did not in fact follow through with its demand that 10% of the purchase price is required at the time of order placement," Mr. Hughett is offering the legal conclusion that, in fact, a 10% payment was due when the order was placed.[4]  Further, there is no indication from the record that Mr. Hughett has personal knowledge of Plaintiff's "custom and practice" related to billing, as is implicated in the statement.  Indeed, the only support for this conclusion is the statement of BPS Financial Officer Cary Evans who stated that BPS will ask for a down payment from customers BPS doesn't know or where the items are custom made.  Mr. Hughett fails to specifically identify the industry standards both satisfied and "ignored" by Plaintiff, or how he came to this conclusion. Consequently, Plaintiff's objections are **SUSTAINED**.

### 3. Objections to Statements in the Report, Page 8

Hughett indicated in his report:  "The requirements for the order were not met and thus there was no order. This is customary in the industry where there are requirements to orders. These failures on the part of BPS created a situation resulted in no order being placed."  (Doc. 48-5 at 17)

Plaintiff objects, "This statement lacks foundation in that it is speculative, conclusory and

---

[4] While Mr. Hughett appears to have significant experience in the field of oilfield production, there is nothing to suggest that he is qualified as an expert to determine the practices and standards of BPS (assuming that is a topic upon which expert testimony is permitted), whether BPS "follow[ed] through with its demand that 10% of the purchase price is required at the time of order placement" or that BPS was obligated to do so.

10

represents an unqualified opinion as to the industry custom.  The statement is also an impermissible

legal conclusion." (Doc. 55 at 4, citing Fed. R. Evid. 701; *Long Beach Police Officers' Assoc. v.*

*Luman*, 2001 WL 1729693, at *1 (C.D. Cal. May 10, 2001); *Flintkote Co. v. Gen. Accident Assurance*

*Co.*, 410 F. Supp. 2d 875 (N.D. Cal. 2006))

As discussed above, whether the contract was formed is a question of law, reserved to the

Court.  *See PMI Mortgage Ins. Co*, 291 Fed. App'x. at 41; *Nationwide Transp. Fin.,* 523 F.3d at 1058.

Consequently, Hughett's opinion is improper, and Plaintiff's objections are **SUSTAINED**.

### 4. Objections to Statements in the Report, Page 10-11

Plaintiff objects to the following statement in Hughett's report:

> It is customary in the industry to require down payments for new customers purchasing items that have to be manufactured. There may be other requirements such as credit rating checks and personal guarantees which again are customary. BPS determined that it would require a 10% down payment to be made with the order. No manufacturing was to begin until the down payment was made. This is consistent with industry custom and practice.

(Doc. 55 at 4, quoting Doc. 48-5 at 19-20)  According to Plaintiff, the statement "is speculative,

conclusory, and an unqualified opinion beyond the expertise and personal knowledge" of Hughett.  (*Id.*,

citing Fed. R. Evid. 602; *Hunt- Wesson Foods*, 627 F.2d 919)

As Plaintiff observes, the Ninth Circuit determined it was appropriate to strike portions of an

opinion where the expert "ha[d] simply drawn inferences about what could have happened."  *Hunt-*

*Wesson*, 627 at 929.  Here, as in *Hunt-Wesson*, it appears that Hughett drew inferences regarding what

occurred rather than having evidentiary support for his conclusion.  He cites no evidence to support his

assertion that manufacturing was not to begin until the down payment was made.[5]  However, the

customs in the industry are within his personal knowledge.  Accordingly, Plaintiff's objections are

**SUSTAINED IN PART**, and the last three sentences of this paragraph are stricken.

### 5. Objections to Statements in the Report, Page 11

Hughett noted in his report that "BPS ordered its supplier to begin manufacture of the actuators

without consultation with Cornerstone."  (Doc. 48-5 at 20)  Plaintiff objects this statement "lacks

foundation" and is "not based on [his] personal knowledge."  (Doc. 55 at 3)

---

[5] Notably, this question involves the legal issue of whether a waiver occurred which, in this case, is not within the purview of an expert.

1      Notably, Hughett is not stating any "scientific, technical, or other specialized knowledge"

2 within the scope of an expert's testimony.  *See* Fed. R. Evid. 702.  Expert testimony is not admissible

3 "if it concerns factual issues within the knowledge and experience of ordinary lay people, because it

4 would not assist the trier of fact in analyzing the evidence."  *In re Apollo Group, Inc. Sec. Litig.*, 527

5 F.Supp.2d 957, 961-92 (D. Ariz. 2007).  Similarly, "expert testimony that merely tells the jury what

6 result to reach is inadmissible."  *Id.*  Because when BPS began manufacturing the actuators is within

7 the knowledge of lay people, this statement is inadmissible as expert testimony.  Likewise, the

8 statement that the manufacturing began "without consultation with Cornerstone" tells the finder of fact

9 what conclusion to reach related to the factual dispute regarding whether Cornerstone pushed for the

10 manufacturing to begin.  Finally, as Plaintiff asserts, there is no indication these facts are within the

11 personal knowledge of John Hughett.  Therefore, Plaintiff's objections are **SUSTAINED**.

12             6.     Objections to Statement regarding the Use of Order

13      Plaintiff notes Hughett concluded: "Even if the complete order was manufactured it may be

14 used on other manufactures valves. There is a mounting bracket (flange) that mounts the actuator to the

15 valve. This bracket may need to be changed but then the actuator may be used on other manufactures

16 valves."  (Doc. 55 at 5, quoting Doc. 48-5 at 20)  Plaintiff contends the statement "lacks foundation, is

17 conclusory, speculative, vague and ambiguous as to where or how the actuators could be used, the cost

18 of and specific nature of the changes required for such use."  (*Id.*)

19      Significantly, however, Hughett indicated in his declaration that he saw "some of the items that

20 the plaintiff has claimed were manufactured," and reviewed the "transaction documents," which

21 indicated the products ordered.  (Doc. 48-5 at 2, Hughett Decl. ¶¶ 2, 6)  The design and use of the

22 mounting bracket, actuator, and valve are within the scope of his expertise.  Although Hughett's report

23 does not specify how or where the actuators could be used or the cost of modifications, the information

24 provided nevertheless assists the fact-finder with understanding the mechanics of the products in the

25 purchase order.  *See* Fed. R. Evid. 702.  Accordingly, Plaintiff's objections are **OVERRULED**.

26             7.     Objections to the Admissibility of the Declaration and Report

27      Plaintiff contends, "The declaration and written report are not based on foundational facts

28 within declarant's personal knowledge."  (Doc. 55 at 5)  Defendants respond that "In the report, and

1  during the deposition… Mr. Hughett provided the basis for his findings, he discussed his qualifications

2  as it relates to the gas and oil industry, in terms of his knowledge of actuators and valves, and all other

3  areas regarding his report and his qualifications." (Doc. 58-14)

4       Under Rule 56, expert testimony may be admissible even if "not based on firsthand knowledge

5  or observation." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 591 (1993) ("an expert is permitted

6  wide latitude to offer opinions, including those that are not based on firsthand knowledge or

7  observation"); *Bieghler v. Kleppe*, 633 F.2d 531, 533 (9th Cir. 1980) (rejecting the argument that an

8  expert affidavit was conclusory and inadmissible because it was based upon hearsay and not personal

9  knowledge).  Hughett asserts he "reviewed all the documents provided to [him] in this case, including

10  deposition transcripts, emails, transaction documents, etc." and visited Plaintiff's facilities in Houston,

11  Texas where he saw some of the manufactured items.  (Doc. 48-5 at 2, ¶¶ 2, 6)  This is sufficient

12  foundation for his expert opinion.  Accordingly, Plaintiff's general objections to the declaration and

13  report of John Hughett are **OVERRULED**.

    14      **B.**     **Defendants' Evidentiary Objections**

    15          1.     <u>Declaration of Bob Smith</u>

    16             *a.*     *Personal knowledge*

17       Bob Smith reports that he has "worked as the general manager for the Paladon Americas

18  operations of Bakersfield Pipe and Supply, Inc… since its inception." (Doc. 52 at 2, ¶ 1)  According to

19  Smith, he is "responsible for managing all actuator projects, including the preparation of quotes and

20  preparation of purchase orders," as well as "overseeing the production, completion and final testing of

21  all actuator projects." (*Id.*)  Throughout the declaration, Smith discusses the actions *he* took related to

22  quote 06032013/ PO#P766 and communications *he* made and received with Eii Valve/ Cornerstone

23  representatives.  (*See, e.g.*, Doc. 52 at 3-6, ¶¶ 8-30)

24       Clearly Smith's own actions, words, and thoughts are within his personal knowledge, and are

25  not statements made on information and belief.  Accordingly, Defendants' objection that the entire

26  declaration lacks of personal knowledge is **OVERRULED**.  To the extent the Smith reports the content

27  of emails that he neither sent nor received, or information learned at meetings he did not attend (*see*

28  Smith Decl. ¶¶ 51-52, 59), Defendants' objections are **SUSTAINED**. The statements in Paragraphs 52

1   and 59, as well as Exhibits 26 and 29, which Smith sought to authenticate in these paragraphs, are

2   **STRICKEN** for lack of personal knowledge.[6]

3                                    b.      *Sham affidavit*

4          Under the "sham affidavit" rule, "a party cannot create an issue of fact by an affidavit

5   contradicting his prior deposition testimony."  *Kennedy v. Allied Mutual Ins. Co*., 952 F.2d 262, 266

6   (9th Cir. 1991).  The Ninth Circuit explained, "[I]f a party who has been examined at length on

7   deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior

8   testimony, this would greatly diminish the utility of summary judgment as a procedure for screening

9   out sham issues of fact." *Id.* Because of the jury's role in resolving questions of credibility, courts have

10  urged caution when applying the sham affidavit rule. *Id.* (citing *Kennet Murray Corp. v. Bone*, 622 F.2d

11  887, 894 (5th Cir. 1980)); *see also Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (explaining

12  the sham affidavit rule has limited application "because it is in tension with the principle that the court

13  is not to make credibility determinations when granting or denying summary judgment").

14         To determine whether a declaration should be stricken as a sham, the Ninth Circuit requires the

15  district court to "make a factual determination that the contradiction was actually a 'sham,' and created

16  specifically to avoid summary judgment.  *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir.

17  2009).   In addition, "the inconsistency between a party's deposition testimony and subsequent affidavit

18  must be clear and unambiguous to justify striking the affidavit."  *Id.* at 998-99.  The Court explained

19  that "minor conflicts between [a declarant's] earlier deposition testimony and subsequent declaration…

20  do not justify invocation of the sham affidavit rule."  *Id.* at 999.

21         The Court does not find the purported conflicts identified between Smith's deposition testimony

22  and the declaration warrant application of the "sham affidavit rule."  For example, at his deposition,

23  Smith testified that it was "not [his] custom and practice in . . . 35 years of experience requiring a down

24

25  _____

26        [6] "A document authenticated through personal knowledge must be attached to an affidavit, and the affiant must be
    a competent 'witness who wrote [the document], signed it, used it, or saw others do so.'"  *Las Vegas Sands, LLC v. Nehme*,
    632 F.3d 526, 533 (9th Cir. 2011) (quoting Orr, 285 F.3d at 773-74 & n.8).  Smith does not assert that he either sent or
27  received these emails, and the exhibits identified do not indicate Smith was copied on the identified emails.  Without any
    evidence that Smith has personal knowledge regarding the authenticity of these emails, they are not admissible.  *See Las
    Vegas Sands*, 632 F.3d at 533.  Likewise, if BPS is relying upon these documents as business records, it has failed to
28  provide the proper foundation to do so.

                                                    14

1   payment." (Doc. 48-3 at 18, Smith Depo. 61:13-14)  Defendants argue Smith's later statement in the

2   declaration that he "saw no reason to object to the deposit" (Smith Decl. ¶ 17) is "inconsistent" with the

3   prior testimony.  (Doc. 58-15 at 6)  However, there is no conflict between the two statements.  The fact

4   that he chose to accept a down payment that was offered by the defendants does not contradict his

5   practice of not requiring a down payment.

6          Defendants also contend Plaintiff presented a sham affidavit in response to Disputed Material

7   Fact 45, which states "P766 revision 5 does not say that the down payment is to be made 'at order

8   placement.'  (*See id.* at 9-10)  Notably, to support this fact, Plaintiffs cite to the document itself,

9   attached as an exhibit to the declaration of Smith.  (*See id.*)  Indeed, though this document reads, "10%

10  DOWN, NET 10, VALIDITY 30," there is *no* indication when the "down" was to be paid, whether

11  before manufacture began, before delivery or at some other time.  Moreover, when asked whether the

12  document required a ten-percent down payment before the manufacturing began, BPS properly

13  objected that the "[d]ocument speaks for itself."  (Doc. 48-3 at 16) Because Defendants fail to identify

14  any "clear and unambiguous" conflicts between the deposition testimony and subsequent declaration of

15  Bob Smith, the Court does not find the declaration is a sham.  Consequently, Defendants' objection to

16  the declaration as a "sham" is **OVERRULED**.

17                    *c.     General objections*

18         Defendants object to 79 statements in Smith's declaration on the same grounds: hearsay,

19  irrelevant, immaterial, "and not reasonably calculated to the discovery of admissible evidence."  (*See*

20  Doc. 58-10 at 3-20)  Thus, Defendants objections are merely "boilerplate recitations of evidentiary

21  principles or blanket objections without analysis applied to specific items  of evidence." *Stonefire Grill,*

22  *Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013) (citation omitted).  For this

23  reason, the Court declines to address each of the 79 boilerplate objections.  *Id.*; *see also Capitol*

24  *Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (observing "it is often

25  unnecessary and impractical for a court to methodically scrutinize each objection and give a full

26  analysis of each argument raised").

27         Previously, this Court observed that "attorneys routinely raise every objection imaginable

28  without regard to whether the objections are necessary, or even useful, given the nature of summary

1   judgment motions in general, and the facts of their cases in particular." *Burch v. Regents of the Univ.*

2   *of Cal.*, 453 F.Supp. 2d 1110, 1119 (E.D. Cal. 2006)  Indeed, there is no explanation for why

3   Defendants believe the objection that a statement is "not reasonably calculated to the discovery of

4   admissible evidence" is applicable related to evidence before the Court on a motion for summary

5   judgment.  Similarly, "objections to evidence on the ground that it is irrelevant" are inappropriate—

6   because the Court must determine whether a fact is relevant and material as part of "the summary

7   judgment standard itself." *See id.*  Accordingly, Defendants' objections on these grounds, are

8   **OVERRULED**.

9       Furthermore, Defendant's numerous hearsay objections should not be sustained at this stage of

10  the proceedings.  *See Quanta Indem. Co. v. Amberwood Dev. Inc.*, 2014 WL 1246144, at *3 (D. Ariz.

11  Mar. 26, 2014) ("evidence containing hearsay statements is admissible only if offered in opposition to

12  the motion").  On summary judgment, "objections to the *form* in which the evidence is presented are

13  particularly misguided where, as here, they target the non-moving party's evidence." *Burch*, 433 F.

14  Supp. 2d at 1119 (emphasis in original).  Moreover, the majority of the challenged evidence appears to

15  be admissible under Federal Rule of Evidence 801(d). An opposing party's statement offered against

16  that party is not considered hearsay. Fed. R. Evid. 801(d)(2)(A).  Likewise, statements offered against a

17  party that were made by the party's agent or employee on a topic that is within the scope of the

18  employment relationship, are excluded from the hearsay rule. Fed. R. Evid. 801(d)(2)(D).  Therefore,

19  statements made by defendant Gupta, as well as agents and employees of Eii Valve/Cornerstone—such

20  as Tom Thompson, Kiley Wallace, and Annette Sealy—are excluded from the hearsay rule.

21  Accordingly, Defendants' objections to statements made by Defendant Gupta and employees of Eii

22  Valve and Cornerstone are **OVERRULED**.

23          2.      Declaration of Dan Byrum

24              a.      *Lack of personal knowledge*

25      Defendants object to the declaration of Dan Byrum, asserting that "nowhere in the declaration

26  does the declaration state that the information is based on Dan Byrum's own personal knowledge."

27  (Doc. 58-11 at 2)  However, the declaration lays forth sufficient facts to demonstrate Byrum's personal

28  knowledge.  For example, Byrum reports he is the President of BPS, and provides background

information regarding the business.  (Doc. 54 at 2, Byrum Decl. ¶¶ 1-5)  In addition, Byrum asserts he "*personally reviewed* the Cornerstone credit application and approved the extension of $2,000,000 in credit to Cornerstone on July 11, 2013." (*Id.*, ¶ 9, emphasis added).  Therefore, Defendants' objections as to the lack of personal knowledge are **OVERRULED**.

### b.    Sham affidavit

Defendants also contend Byrum's declaration is a "sham," and identify several statements they believe conflict with his deposition testimony.  (Doc. 58-11 at 2-3)  In the declaration, Byrum reported that he "was never told by anyone during the pendency of the Cornerstone purchase order to Paladon Americas that Cornerstone believed that the down payment was required to be paid before BPS began work fulfilling the purchase order."  (Doc. 54 at 2, Byrum Decl. ¶10)  Byrum stated that he was "aware of no standard in the industry that requires a deposit to be paid before work begins on a purchase order, particularly when the purchase order requires strict adherence to a deadline."  (*Id.* at 2, ¶ 11)  Bryum reported, "BPS never would have entered a contract with Cornerstone had it known that Cornerstone would take the position that there was no enforceable contract until a down payment had been made." (*Id.* at 3, ¶ 12)

On the other hand, at his deposition, Byrum confirmed he received an email from Diane Nennig that explained the proposed terms of the deal.  (Doc. 58-2 at 8, Byrum Depo. 25:9-12)  The email stated in relevant part:

> We have a new customer wanting to set up an account with BPS and have a $2,250,000.00 order for Paladon Americas pending. They are agreeing to pay 10% down at order placement ($221K) and then pay NET 10 Days [w]hen material ships.

(Doc. 58-3 at 3, Bryum Depo. Ex. 101)  Byrum responded that Cornerstone was "[g]ood to go" for a credit line of $2,000,000.  (*Id.*)  Byrum testified he had expected a 10 percent payment, but had "no idea" when it was supposed to be paid.  (Doc. 58-2 at 9, Byrum Depo. 28:15-29:4)  He did not discuss whether there was an industry standard requiring a deposit to be paid before work begins, but believed "far less than 1 percent" of the "thousands" of orders BPS receives each year have a provision requiring a down payment.  (*Id.* at 11-12, Byrum Depo. 37:15- 38:7)

Although Byrum's declaration and deposition testimony are inconsistent regarding whether he knew Cornerstone was agreement to pay the 10% "at order placement," this single inconsistency is not

sufficient to support a conclusion that the entire declaration is a sham and should be stricken.  To the contrary, the other identified statements are consistent with other evidence presented by Plaintiff that BPS did not intend to *require* Cornerstone to pay the 10% at the order placement.  Accordingly, Defendants' objections that the declaration is a sham are **OVERRULED**.

### 3.   Declaration of Matthew McCartney

In his declaration, Mr. McCartney reports he was "responsible for working with BPS representatives to obtain documents pursuant to FRCP 26 as well as in response to written discovery propounded by defendants." (Doc. 53 at 2, ¶¶ 2-3) He also "review[ed] the various documents produced by defendant Cornerstone Valve in this dispute. *Id.* He conducted the depositions of Annette Sealy, Kiley Wallace, Nitesh Gupta, and Jim Talley.  (*Id.* at 2-3, ¶¶ 5-9)  Thus, the declaration sets forth sufficient facts for the Court to determine that Matthew McCartney has personal knowledge of the discovery produced and the depositions taken in this matter.  Defendants' objections to his lack of personal knowledge are **OVERRULED**.

### C.   Conclusion

To the extent that statements offered by either party are speculative or represent a legal conclusion, the Court, as a matter of course, will not factor that material into the analysis. *See Burch*, 433 F. Supp.2d at 1119  ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not *facts* and likewise will  not be considered on a motion for summary judgment. Objections on any of these grounds are simply superfluous in this context.") (citation omitted, emphasis in original).  Rather, the Court's analysis relies on evidence only that it has deemed admissible.

## III.   Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that

1  claim.  Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981)

2  ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a

3  single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a

4  motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ.

5  P. 56 (a), (c); *Mora v. Chem-Tronics*, 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

6          Summary judgment, or summary adjudication, should be entered "after adequate time for

7  discovery and upon motion, against a party who fails to make a showing sufficient to establish the

8  existence of an element essential to that party's case, and on which that party will bear the burden of

9  proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial

10 responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex,* 477 U.S. at

11 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find

12 for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the

13 governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem*

14 *Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is

15 appropriate by "informing the district court of the basis of its motion, and identifying those portions of

16 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits,

17 if any,' which it believes demonstrates the absence of a genuine issue of material fact."  *Celotex*, 477

18 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

19         If the moving party meets its initial burden, the burden then shifts to the opposing party to

20 present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e);

21 *Matsushita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some

22 metaphysical doubt as to the material facts."  *Id.* at 587.  The party is required to tender evidence of

23 specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention

24 that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  Further, the opposing party is not

25 required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed

26 factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth

27 at trial."  *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir.

28 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case

1    necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

2        The Court must apply standards consistent with Rule 56 to determine whether the moving party

3    demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.

4    *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary

5    judgment, the Court can only consider admissible evidence.  *Orr v. Bank of America, NT & SA*, 285

6    F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854

7    F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the

8    nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party.  *Orr*,

9    285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

10   **IV.    Discussion and Analysis**

11       **A.    Breach of Contract**

12       Plaintiff alleges Cornerstone and Gupta are liable for breaching the agreement to purchase

13   actuators, fittings, controls, and industrial supplies pursuant to purchase order #P766.  (Doc. 23 at 2-3)

14   Defendants contend they are entitled to summary judgment on this claim, asserting 10% payment was a

15   condition precedent that was not satisfied and, as a result, a contract "was never consummated."  (Doc.

16   48 at 7, emphasis omitted)  In the alternative, Defendants contend that even if the Court concludes there

17   was an agreement between the parties, Defendants were entitled to cancel the order.  (*Id.* at 6)

18           1.    Contracts under California law

19       A claim of breach of contract arises under state law, and requires a plaintiff to demonstrate (1)

20   the existence of a contract[7], (2) performance or excuse for nonperformance by the plaintiff, (3) breach

21   by the defendants, and (4) resulting damages.  *Alcalde v. NAC Real Estate Invs. & Assignments, Inc.*,

22   316 Fed. App'x 661, 662 (9th Cir. 2009) (citing *First Comm. Mort. Co. v. Reece*, 108 Cal. Rptr. 2d 23,

23   33 (Ct. App. 2001)); *see also Haberbush v. Clark Oil Trading Co.*, 33 Fed. App'x 896, 898 (9th Cir.

24   2002) (identifying "agreement, consideration, performance by plaintiff, breach by defendant, and

25   damages" as elements to a breach of contract).  California law requires a showing of "appreciable and

26

27       ───────────────
         [7] Pursuant to California contract law, the elements for a viable contract are "(1) parties capable of contracting; (2)
28   their consent; (3) a lawful object; and (4) sufficient cause or consideration."  *United States ex rel. Oliver v. Parsons Co.*, 195
     F.3d 457, 462 (9th Cir. 1999) (citing Cal. Civ. Code § 1550; *Marshall & Co. v. Weisel*, 242 Cal. App. 2d 191, 196 (1966)).

1  actual damage" to succeed on a breach of contract claim. *Aguilera v. Pirelli Armstrong Tire Corp.*, 223

2  F.3d 1010, 1015 (9th Cir. 2000).  Thus, nominal damages and speculative harm do not suffice.  *Ruiz v.*

3  *Gap, Inc.*, 622 F. Supp. 2d 908, 917 (N.D. Cal. 2009).

4         2.     Discussion

5       Notably, it is undisputed that "Bakersfield Pipe & Supply, Inc. entered into a written contract

6  with defendant Cornerstone Valve, LLC wherein Bakersfield Pipe & Supply, Inc. was to provide

7  actuators, controls and mounting brackets for valves which were to be supplied by Cornerstone Valve,

8  LLC." (DUF 4, Doc. 50 at 2-3)  However, the parties disagree regarding the terms of the contract

9  related to the 10% payment—including whether this term was a condition precedent, and whether

10  Defendants breached the agreement.

11       When entering an agreement, parties may "agree that a right or duty is conditional upon the

12  occurrence or nonoccurrence of an act or event."  *Platt Pacific, Inc. v. Andelson*, 6 Cal.4th 307, 313,

13  (1993).  A condition precedent is an act that "is to be performed before some right dependent thereon

14  accrues, or some act depending thereon is performed."  Cal Civ. Code § 1436 (2016).  Conditions

15  precedent may be express or implied, but "provisions of a contract will not be construed as conditions

16  precedent in the absence of language plainly requiring such a construction."  *Rubin v. Fuchs*, 1 Cal.3d

17  50, 53 (1969).   In general, "conditions precedent are not favored and an agreement will be strictly

18  construed against a party asserting that its provisions impose a condition precedent."  *Helzel v. Superior*

19  *Court*, 123 Cal. App.3d 652, 663 (1981).

20       Defendants contend "the purchase order clearly stated that 10% was to be paid at order

21  placement," and "plaintiff's obligations did not begin on the purchase order until a 10% down payment

22  was paid." (Doc. 48 at 8)  However, when Cornerstone first submitted its purchase order on July 11,

23  2013, there was no indication that a 10% deposit was to be paid.  (*See* Doc. 52-6 at 1)  The day after

24  receiving the purchase order from Cornerstone, Smith "provided Paladin Italia with a BPS purchase

25  order for the various actuators." (PUF 40; Doc. 52 at 6, Smith Decl. ¶ 24)  Clearly, if Smith believed

26  the 10% payment was required prior to beginning manufacturing, he would not have placed the order

27  with Paladin Italia.  Only on later revisions to PO# P766 dated July 19, 2013 and August 13, 2013 did

28  the payment term "10% DOWN" appear typed onto the form.  (Doc. 52-6 at 4; Doc. 52-8 at 1)  Thus, it

21

appears there was no meeting of the minds on this term and the term fails.

On the other hand, the plain language of the purchase order does not support a conclusion that the 10% was a condition precedent to the formation of the contract because there is no indication *when* the 10% "down" was to be paid.  Normally the terms of a contract alone control its interpretation: "when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing." *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.*, 55 Cal.4th 1169, 1174 (2013) (citing Cal. Code Civ. Proc. § 1856 and Cal. Civ. Code § 1625). The parol evidence rule "is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement." *Riverisland*, 55 Cal.4th at 1174. Because a contract's "written terms supersede statements made during the negotiations," evidence other than those written terms is "irrelevant, and cannot be relied upon." *Id.* (emphasis omitted).  However, where a term is ambiguous, the Court may consider extrinsic evidence.  *Alameda Cnty. Flood Control v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1188-89 (2013).

The parties present conflicting evidence as to the meaning of the term "10% DOWN": Defendants argue the "industry standard" requires an interpretation that the 10% was due upon order placement (Doc. 48 at 8), while Plaintiff believed the 10% was due only when BPS presented Cornerstone with an invoice requesting the payment (Doc. 49 at 21; *see also* Doc. 52 at 15 ¶ 66).

The Court notes that the "10% down" was not paid when the order was submitted on July 11, 2013.  Despite this, Thompson met with Smith in Italy on July 28, 2013 and "toured the Paladon Italia factory," where "manufacturing was underway" already. (PUF 51)  This gives rise to an inference that because the project was underway at that time—and Defendant's personnel were aware of this fact— that there was not a requirement for the "10% down" to be paid before the contract began. On the other hand, if there were a requirement for a 10% deposit before the manufacture would begin, clearly this was waived by Plaintiff.[8] *See Sosin v. Richardson*, 210 Cal. App. 2d 258, 264 (1962) (explaining a contractual condition may be deemed waived when the actions of a party justify the other party in

---

[8]Under California law, "[a] party who prevents fulfillment of a condition of his own obligation . . . cannot rely on such condition to defeat his liability." *Jacobs v. Tenneco West, Inc*., 186 Cal.App.3d 1413, 1418 (1986).  Here, Defendants make this very argument—by asserting Cornerstone was obligated to make a 10% payment but failed to make it, and is therefore not liable for the remaining balance under the terms of the contract.

believing terms "will be performed despite the failure to perform the condition).

Finally, even if the "10% down" term were a condition precedent, it was the plaintiff's performance which would have been excused upon the failure to pay the deposit, not the defendants'. "A party who prevents fulfillment of a condition of his own obligation . . . cannot rely on such condition to defeat his liability." *Jacobs v. Tenneco West, Inc.*, 186 Cal.App.3d 1413, 1418 (1986). Despite this well-settled proposition, Defendants make this very argument when they assert that because Cornerstone was obligated to make a 10% payment and failed to do so, they are not liable for the remaining balance under the terms of the contract; not so.

Toward this end, Defendants rely upon *Consolidated World Investments, Inc. v. Lido Preferred Ltd.*, 9 Cal.App.4th 373 (1992). In *Consolidated*, the plaintiff failed to open an escrow account which was the condition precedent to the defendant's performance. *Id.* at 527-528. Thus, the court determined that the plaintiff was not entitled to force the defendant to perform. *Id.* Despite the Defendants' interpretation of *Consolidated,* it speaks only to the fact that when there is a condition precedent that one party is required to satisfy, the *other* party is excused from his performance. *Consolidated* does not suggest that a party's failure to perform a condition precedent excuses *his own* obligations under the contract. Therefore, for a number of reasons, Defendants fail to demonstrate summary adjudication of the breach of contract claim is appropriate.

### B.    Common Count

Plaintiff's second cause of action is for a "common count." (Doc. 23 at 4) Citing California Civil Jury Instruction 371, Defendants contend Plaintiff "must prove the following:

1.    That defendant requested, by words or by conduct, that plaintiff deliver goods for the benefit of defendant;

2.    That plaintiff delivered the goods as requested;

3.    That defendant has not paid plaintiff for the goods; and

4.    The reasonable value of the goods provided."

(Doc. 48 at 9) Defendants assert Plaintiff's claim fails because (1) "there never was a contract since defendant Cornerstone never paid the 10% at order placement" and (2) "the goods have never been delivered to Cornerstone." (*Id.*)

23

The Court rejects the argument related to the 10% payment for the reason set forth above. In addition, despite Defendants' contentions, delivery to Cornerstone is not required for Plaintiff to succeed on this claim.  California's Fourth District Court of Appeal determined that to be entitled to a common count, a plaintiff must demonstrate "(1)… indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment." *Farmers Ins. Exch. v. Zerin*, 53 Cal. App. 4th 445, 460 (1997).  Here, Plaintiff has presented evidence that the parties entered into an agreement for actuators, controls and mounting brackets for valves, which were ordered by BPS, manufactured, and delivered to Houston.  (Doc. 52 at 18, Smith Decl. ¶¶ 88-90)  Thus, it appears Plaintiff identifies the "work done" pursuant to the purchase orders, despite the fact that Cornerstone failed to supply its valves to BPS onto which BPS was to mount the actuators and brackets.  *See Zerin*, 53 Cal. App. 4th at 460; *see also* CAJI 371 (requiring, in the alternative, a plaintiff to show the company "performed the services" as requested).  Because Defendants fail to demonstrate they are entitled to summary adjudication for Plaintiff's second claim for relief, the motion is **DENIED**.[9]

### C.    Deceit and Concealment

Plaintiffs assert Defendants are liable for deceit and concealment, asserting Defendants concealed information regarding the identity of Cornerstone's client, and contend if the actual client was known by BPS, the credit application would not have been approved and the purchase order would not have been accepted.  (Doc. 49 at 16-21)  In addition, Plaintiffs allege that defendant Gupta and Cornerstone representatives including Tom Thompson and Kiley Wallace mislead BPS into thinking the project was viable, and the manufacture and delivery needed to be expedited.  (Doc. 23 at 5-6)  In short, it appears that Plaintiff claims it was fraudulently induced to enter into the contract.

Withholding material information may constitute fraud through concealment.  *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 291 (2004).  Similarly, even where all affirmative statements are true, suppressing or failing to provide other material information that affects the

---

[9] Notably, however, under California law "[a] common count is not a specific cause of action." *McBride v. Boughton*, 123 Cal.App.4th 379, 394, 20 Cal. Rptr. 3d 115 (2004).  Instead, "it is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness." *Id.* Common counts are generally used to recover a certain sum of money "without necessarily specifying the nature of the claim." *Martini E Ricci Iamino S.P.A.--Consortile Societa Agricola v. Trinity Fruit Sales Co.*, 30 F.Supp.3d 954, 975 (E.D. Cal. 2014).  Here, the nature of the claim—a breach of contract—is clearly raised by Plaintiff as the first claim for relief in the Amended Complaint.  (*See* Doc. 23 at 4)

statement is actionable as deceit.  *Lovejoy v. AT&T Corp.*, 92 Cal. App. 4th 85, 95 (2001).  Under California law, "[t]he elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage."  *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

Smith reports that while he was working on quote 06032013, "Thompson told [him] that the project was in Iraq."  (PUF 14; Smith Decl. ¶ 13)  Plaintiff now believes that "Gupta was using Cornerstone in combination with his AVSCO enterprise to manufacture and sell goods sourced from the United States to Iran."  (Doc. 54 at 3, Byrum Decl. ¶ 14)  According to Dan Byrum, "BPS does not sell its goods to Iran," and although he "personally approved" the credit application, he "never would have extended credit to Cornerstone" if BPS had known of the connection with Gupta, and that the goods were intended to be shipped to Iran, not Iraq.  (*Id.*, ¶¶ 13-14; *see also* Smith ¶¶ 67, 69, 79)  Thus, contrary to Defendants' assertion, Plaintiffs present evidence of misrepresentations by Defendants.  Consequently, the motion for summary judgment, on these grounds, is **DENIED**.

### D.      Punitive Damages

Defendants renew their argument that Plaintiff is not entitled to seek punitive damages in this action, arguing "there is simply no triable issue of [f]act to warrant an award for punitive damages." (Doc. 48 at 11)  Defendants assert that punitive damages are not awardable in a breach of contract case; the Court agrees.  However, in addition to contract claims, Plaintiff asserts the tort claim for deceit and concealment.

Generally, punitive damages are not awardable where at issue are purely economic losses. *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 995, 102 P.3d 268, 277 (2004); *S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1376 (9th Cir. 1978).  However, this rule is not absolute.  In *Robinson*, the Court held, "the economic loss rule does not bar [the] fraud and intentional misrepresentation claims because they were independent of [the] breach of contract."  *Robinson* at 991.

In *Walker v. Signal Companies, Inc.*, 84 Cal.App.3d 982, 996 (Ct. App. 1978), the court considered whether punitive damages could be awarded for the fraudulent inducement to contract.  The court held,

> Defendants contend plaintiffs are not entitled to punitive damages because their action is one for breach of contract and not for fraud. Punitive damages are not recoverable in an action for breach of contract no matter how wilful, malicious or fraudulent the breach. (Civ.Code, s 3294; *Crogan v. Metz* (1956) 47 Cal.2d 398, 405, 303 P.2d 1029.) They may, however,"(b)e awarded where a defendant fraudulently induces the plaintiff to enter into a contract. (footnote omitted) *Kuchta v. Allied Builders Corp.,* 21 Cal.App.3d 541, 549, 98 Cal.Rptr. 588; *Horn v. Guaranty Chevrolet Motors*, 270 Cal.App.2d 477, 484, 75 Cal.Rptr. 871.) The words 'oppression, fraud, or malice' in Civil Code section 3294 being in the disjunctive, fraud alone is an adequate basis for awarding punitive damages. (*Miller v. National American Life Ins. Co., supra,* 54 Cal.App.3d 331, 336, 126 Cal.Rptr. 731; *Horn v. Guaranty Chevrolet Motors, supra,* 270 Cal.App.2d 477, 484, 75 Cal.Rptr. 871.)" (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101, 135, 135 Cal.Rptr. 802, 822.)

*Id.*  Likewise, this Court has held that punitive damages may be sought where the tort liability is independent of the breach of contract.  *Copart, Inc. v. Sparta Consulting, Inc.*, 2015 WL 3622618, at *12 (E.D. Cal. June 9, 2015).  The Court ruled,

> Here, Copart relied on Sparta's representations and assertions of expertise in its decision to enter into the contract and accept Sparta's bid. Sparta's representations, Copart alleges, were made with knowing falsity and caused economic damage. They were also made prior to and separately from the alleged breach. The fraud-based allegations identify statements, representations, and promises of Sparta's capabilities prior to the contract; these statements do not support the allegations of breach based on Sparta's failure to perform its contractual obligations. Copart's allegations that Sparta fraudulently induced the contract and misrepresented material information satisfies an established exception to the general bar of tort recovery for claims also related to breaches of contract. The motion to dismiss these claims is denied.

*Id.* at *13.  As in *Copart*, here the alleged acts causing the plaintiff to enter into the contract occurred before and independently of the breach.

A plaintiff is entitled to punitive damages if he or she can show by clear and convincing evidence that the defendants were guilty of "malice, fraud or oppression."  Cal. Civ. Code § 3294. Plaintiff has shown that there are triable issues of fact related to deceit and concealment.  Consequently, whether Defendants acted fraudulently is a question for the jury.  *See Stevens v. Owens-Corning Fiberglas Corp*., 49 Cal. App. 4th 1645, 1658 (1996) ("[w]hether to award punitive damages and how much to award [are] questions for the jury").  Accordingly, Defendants' motion for summary judgment as to the prayer for punitive damages is **DENIED**.

## VI.    Conclusion and Order

Defendants have not carried their burden to show an absence of a genuine issue of material fact related to Plaintiff's claims.  *See Celotex,* 477 U.S. at 323.  A jury must make credibility determinations

and resolve the conflicts between the evidence.  *See T.W. Electrical Serv., Inc.*, 809 F.2d at 630.

Based upon the foregoing, the Court **ORDERS** that Defendants' motion for summary judgment (Doc. 48) is **DENIED**.

IT IS SO ORDERED.

Dated:   **June 28, 2016**                           **/s/ Jennifer L. Thurston**
                                                    UNITED STATES MAGISTRATE JUDGE